**THE TOSCANO LAW FIRM, LLC**
80 Bloomfield Ave.
Suite 101
Caldwell, NJ  07006
Phone:  973-226-l691
Facsimile:  973-226-l693

**Attorneys for Plaintiff**

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMUEL KIM, Ho-Ho-Kus Police Officer,<br><br>                Plaintiff,<br>v.<br><br>BOROUGH OF PALISADES PARK and LIEUTENANT SHAWN LEE (in his official and individual capacities),<br><br>                Defendants. | **COMPLAINT and JURY DEMAND** |

## INTRODUCTION

1. This is an action for monetary damages brought by plaintiff Police Officer Samuel Kim (SK) pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, his First Amendment Freedom of Assembly rights, N.J.S.A. 10:6-2, N.J.S.A. 34: 19-1, et seq. and the common law of the State of New Jersey, against both defendants Borough of Palisades Park (BPP) and Lieutenant Shawn Lee (SL), in both his official and individual capacities.

## JURISDICTION AND VENUE OF THIS UNITED STATES DISTRICT COURT

2. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§. 1331, 1343 (3) and (4), 42 U.S.C. §§ 1983 and 1988, as well as (as stated above) the First, Fourth and Fourteenth Amendments to the United States Constitution dealing with freedom of assembly, freedom from unlawful search and seizures, loss of physical liberty and freedom from the use of excessive, unreasonable and unjustified force by defendant SL upon SK.

3. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because the events/omissions giving rise to these causes of action all occurred in the District of New Jersey.

## PARTIES

4. Plaintiff SK, at all relevant times mentioned herein, was a Police Officer of Asian ethnicity employed by defendant BPP in its municipal police department, being hired on November 22, 2016. He is an outstanding law enforcement officer in his own right. His professional reputation among law enforcement is essentially unimpeachable, unsullied and impeccable. His work record is one of an assiduous, dedicated and decorated law enforcement officer, and is what every forthright and honest law enforcement officer emulates to be. His demeanor on and off the job is ideal. Simply put, he is the quintessential law enforcement officer. As a result of the years long psychological and physical abuse of SK by defendant SL, fueled by the deliberate indifference and long-established and engrained policies, customs and habits of defendant BPP, SK was constructively discharged from the PPPD and joined the Ho-Ho-Kus, New Jersey Police department, where he currently flourishes, without any issues whatsoever, day to day.

2

5. Defendant, BPP, is a municipal corporation of the State of New Jersey located in Bergen County. It is governed under the mayor-council-administrator form of government, controlling the day-to-day operations of the PPPD by way of hiring, training, retaining, teaching, disciplining, paying, monitoring, promoting and/or terminating its employees. The BPP is also the public employer of defendant SL. At all relevant times mentioned herein, BPP developed and maintained long-established policies or customs exhibiting the aforesaid deliberate indifference to the constitutional rights of SK, which directly caused all of the following blatant violations of SK's rights at the hands of SL for several years.

6. Defendant, SL, at all times relevant to this Complaint, was a Lieutenant and direct supervisor of SK, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the United States, State of New Jersey and/or the BPP. His actions toward SK (immediately before and during SK's employ with the PPPD) as described hereinafter can only be described as megalomaniacal, reprehensible, shameful, inexcusable, disgraceful, offensive, proscribed, illegal, abusive, unmannerly, criminal and/or unlawful, all of which traits were ignored, with purposeful and/or deliberate indifference, by defendant BPP for years.

## RELEVANT FACTUAL AVERMENTS

7. SK's horrifying nightmare with defendant BPP and at the hands of SL began just before and immediately upon his employ with the BPP.

8. So the saga begins. SL and SK were acquaintances before SK was hired at the PPPD, when SL sheepishly offered to help SK obtain a position with the PPPD after SK expressed a keen interest in same.

3

9. And, although SK unquestionably eventually obtained the position of Patrolman with the PPPD though his own merit, fitness, energies, past law enforcement experience, expertise and congeniality, SL apparently unilaterally decided that SK forever owed him because SL had "put in a good word" for SK at the PPD, as later described by SL.

10. This is precisely when SL, in a warped, perverted, corrupt, deviant and twisted fashion, began to truly and aggressively believe that he could reap the benefits of this perceived debt by making SK his patsy/scapegoat, relentlessly demanding that SK be acquiescent and dutiful to any and all demands, however absurd, ridiculous and/or ludicrous they may be, that SL foisted upon him.

11. Immediately upon being hired, SL demanded that SK perform certain (and constant) favors for him and complete his personal errands while on duty. Initially, SL actually ordered SK to drive his (SK's) daughter to school every morning, along with purchasing SL coffee. In point of fact, and in order to drop off SL's daughter at school, SK had to remove the car seat from SL's vehicle and install it in his own personal car. This was, for want of a better word, bizarre.

12. The insanity, reckless and continuing course of mercurial and vicious conduct of SL continued. In mid to late May, 2018, SK received a text message from a New York Police Department ("NYPD") officer who, like SK, was a member of the Korean American Brotherhood in Law Enforcement ("KABLE").

13. Unbeknownst to SK, SL apparently had illegally promised certain assistance to that officer (for a summons that officer received) upon which he (SL), upon information and belief, had not delivered.

14. SK promptly responded that it would not be at all proper for him to interfere with any properly issued motor vehicle summons, and that for SL to suggest that either of them could do so would constitute an opprobrious abuse of authority/Official Misconduct, a second degree criminal offense. SL, needless to say, was highly offended by SK's stance.

15. At that juncture, and in a clear invasion of both SK's privacy rights and freedom from illegal search and seizure rights, SL grabbed SK's personal cellphone against SK's wishes and scrolled through his personal messages.

16. SL then proceeded to read SK's exchange with the NYPD officer. Both irate and outwardly manic, SL began cursing, blighting and shouting at SK in the restaurant in which they were then seated. From that point forward, SK's incessant bullying, intimidation, victimization and harassment of SK amplified exponentially.

17. Thereafter, SL continued targeting SK by shooting an unending and continuing multitude of fusillades his way, as outlined/explained herein below.

18. In/around October, 2019, SL bemusingly and quizzically accused SK of smirking at him after he greeted SL in the department locker room. SK was flabbergasted and at wits end. Shouting irrationally, SL then called SK a "shipsekki," which is an exceedingly offensive and derogatory term meaning "crybaby" and/or "motherfucker" in Korean.

19. SL's abuse of SK remained relentless, yet defendant BPP did nothing to step in and correct his abusive and illegal behavior, all the while knowing, through upper echelon PPPD supervisors and SK's outward physiognomy, that it was occurring.

20. In/around November, 2018, SL again berated/excoriated SK via text message regarding an offer SK had received to help a local politician, Paul Kim (PK),

during his (PK's) election campaign. This was none of SL's business in the least, as SK had every unfettered and statutory right to support any candidate he chose to, violating no internal rule and regulation of the PPPD whatsoever.

21. SL also made it painstakingly clear to SK that SL expected SK to follow his lead by treating another PPPD Officer, George Beck, with distain simply because SL vehemently disliked him, further violating SK's inalieble right to freedom of assembly with Beck. Of course, SK found this desire/want of SL toward Beck to be both puerile and silly, but was constrained to keep a certain distance away from Beck for fear of SL's fury/wrath.

22. Indeed, SL warned SK numerous times that, "[m]y enemies are your enemies," when referring to Officer Beck and any other person whom SL disliked.

23. Eventually, in October, 2019, SL's chaotic campaign of psychological and physical abuse upon SK manifested itself yet again by way of a senseless verbal and physical assault upon SK after SL gave SK a direct order that SK meet him at his (SL's) parents' home.

24. Already petrified beyond belief, but having no other pragmatic alternative because this was a direct order from his Lieutenant, SK went to that home and stepped inside.

25. Once inside, SL began launching insults, calling SK an "ungrateful piece of shit" and claiming that he "really hurt that day", presumably referring to the aforementioned text messages he had read between SK and the above described NYPD officer.

26. Shouting savagely, brutishly and ferociously, SL demanded that SK quit his job or transfer because he "couldn't be trusted". This is precisely when SK knew full well that his career with the PPPD was essentially decimated/over/destroyed/ruined. Indeed, SK was certain that if he did not leave the PPPD, SL would do all he could to ruin his (SK's)

career in law enforcement and/or stymie any promotional opportunity that SK would have there at the PPPD.

27. But SL went further, apparently knowing that defendant BPP would not question whatever he was doing or would do to SK – this is when SL screamed/screeched, "you better leave…..you better quit".

28. Knowing what SL was all about and his ability to get whatever he wanted within the PPPD, SK knew/thought to himself right then and there, once again, that he was being forced to search for/seek alternative employment to get away from this despot/tyrant.

29. SL's tirade continued inside that house, as SL then grabbed a pair of chopsticks from the table, which he then used as a weapon to repeatedly and forcefully hit SK on the head with, all the while still yelling loud invectives and terrorizations.

30. This unprovoked assault and battery turned even worse when SL then grabbed SK's tie and twisted the knot so tightly that SK literally began choking. SL stands at about 5'11" inches and weighs about 230 pounds, while SK stands at about 5'3" and weighs about 145 pounds.

31. While SK was choking, SL continued to scream and insult SK, yelling "you fucking fake…… you say you're a Christian…… I wonder how you pray … you should be praying to me". Apparently, SL was of the opinion that he (SL) was some sort of divine deity.

32. Simply put, there was no alternative way of describing SL at that juncture – SK thought that SL was a man (who carried a gun and badge) who was out of his mind.

33. That having been said, and when he finally was able to break free, SK froze for a moment in fear until SL shouted, "get out of my fucking house".

34. Subsequent to that bizarre course of events, and scared beyond belief for his personal physical safety and job security, SK nevertheless arrived for his midnight shift that same night.

35. But it was obvious to anyone who had eyes that SK was visibly and emotionally shaken beyond words.

36. In furtherance of PPPD rules and regulations and the NJCEPA, SK reported to a sergeant and some co-workers (who were previously aware of SL's harassment of SK) that SL had violently assaulted him and had threatened his job.

37. SK also properly reported the assault the next day to BPP Councilman Min by text and stated that he "was really scared for my (his) life."

38. Unabashedly, SL afterwards readily admitted that he may have been "too hard" on SK by choking him.

39. Defendant BPP and/or the PPPD should have immediately referred the clear and distinct assault by SL upon SK to the Bergen County Prosecutors Office (BCPO) or the NJ State Attorney General's Office (NJSAGO), but purposely and/or with deliberate indifference never did so in order to shield the BPP from any civil liability and/or SL from any criminal harm. Defendant BPP should have also promptly began nothing other than termination proceedings as against defendant SL.

40. And with unmitigated hubris SL then, in a sick and perverted way, reminded SK that when SK was first hired, SK had promised to quit or resign if SK ever "backstabbed" SL. Again, SK thought that SL was a man literally out of his mind.

41. As if the above is not enough to make any rational person quiver, this epic was ongoing.

42. On November 1 and November 2, 2019, SL went so far as to harass SK's own father by repeatedly reaching out to him by telephone and by text. And at that time, SL apologized in full for "betraying" SK and admitted he had "hurt him (SK) a lot."

43. On or around November 8, 2019, the PPPD Internal Affairs Division commenced an investigation into SL based on his violent attack upon SL.

44. Additionally, in a deranged fashion and during this same time period, SL had also illegally threatened local business owners with a loss of their liquor licenses if they failed to contribute to his (SL's) favored political candidates, thereby culminating in another internal affairs investigation. The BPP should have immediately referred this to the NJSAGO for criminal charges/grand jury presentation, but never did.

45. Moreover, both Councilman Min and Officer Beck initiated their own IA complaints against SL due to his inappropriate, belligerent and hostile conduct.

46. SK was also denied myriad overtime and special detail assignments for which he might have been available but for properly complaining about SL's years long and never ending mistreatment, all the while defendant BPP offering no additional protections to SK albeit knowing full well what SL was doing to him (SK) for eons.

47. Because of all of the above, SK, in furtherance of his New Jersey Comprehensive Employee Protection Act (NJCEPA – Whistleblower) rights, has his legal counsel at the time draft and forward for filing a Title 59 Notice of Tort Claim (NTC) with defendant BPP.

48. As a direct and proximate result of the filing of said NTC, the defendants directly, quickly and proximately retaliated toward SK in the terms and conditions of his employment by taking adverse action against him in the form of constructively discharging/forcing SK out of the PPPD.

49. But the disgusting, uncaring, apathetic, indifferent, and/or uninterested treatment by both defendants herein toward SK continued.

50. The internal affairs investigation of SL for his above conduct merely resulted in a proposed penalty of a total of forty (40) days suspension, not a termination of SL or referral of SL to face criminal charges.

51. Shockingly, defendant BPP then actually assessed against SL a total of a five (5) day suspension. Simply put, it now all became almost comical, yet career fatal, to SK.

52. Seeing the proverbial writing on the wall, and knowing that defendant BPP would do anything and everything, however illegal, to protect SL and the BPP, and would also do anything it had to do to ensure that SK would one way or another be forced out of the PPPD, SK was forced to seek alternative employment and, after seeking same, accepted a position with the Ho-Ho-Kus, New Jersey Police Department.

53. This constructive discharge could not have been more blatant/evident and was, as mentioned, the direct result of SK's valid complaints to the BPP about what defendant SL had done to him from the time of his employ until the time he was forced out of the PPPD as laid out herein above.

## SPECIFIC CAUSES OF ACTION

### COUNT ONE

### (42 USC 1983)

54. Plaintiff incorporates Paragraphs 1 through 47 as if fully recited herein.

55. In violation of 42 U.S.C. 1983, all defendants, while acting under color of law, violated the plaintiff's Fourth Amendment rights to be free from unlawful/illegal search and seizures of his person and effects, along with his right to privacy, his right to be free from

unreasonable and excessive force and his right to assembly, while also depriving the plaintiff of his right to enjoy these Constitutional protections.

## COUNT TWO

### (ASSAULT AND BATTERY)

56. As can be gleaned from the above, defendant SL assaulted and battered plaintiff SK in an illegal manner, so as to cause SK severe and permanent psychological/physical harm.

## COUNT THREE

### (VIOLATION OF THE NJCEPA, N.J.S.A. 34:19-1 et seq.)

57. The plaintiff, SK is and was at all relevant times an "Employee" as defined in N.J.S.A. 34:19-2(b).

58. Defendants BPP and SL are and at all times were "Employers" as defined in N.J.S.A. 34:19-2(a).

59. Plaintiff SK engaged in protected activity as specifically laid out above when he made/authored written and/or oral complaints, reports, letters, and/or similar documents with the BPP and to his supervisors regarding, and/or disclosed or threatened to disclose, activities, policies or practices of his employer and/or SL he reasonably believed to be in violation of law, rule and/or a regulation promulgated pursuant to law, including, without limitation, the defendants' consistent and continuing violations of the New Jersey State Constitution, NJCEPA and the statutes, regulations, case law and policies governing other employment protocol and procedure.

60. Plaintiff SK also engaged in protected activity by reason of his objection to and refusal to participate in BPP and SL's activities, policies and/or practices described above that he

reasonably believed to be a violation of law, rule, or regulation or were incompatible with a clear mandate of public policy regarding public safety, health and welfare.

61. As set forth above, and in retaliation for the plaintiff "blowing the whistle" and engaging in protected activity, the BPP and/or SL and certain of its upper echelon supervisors took numerous and continuous adverse and egregious employment actions, and engaged, and continued to engage, in a pattern of continuous and systematic retaliatory conduct and reprisals against the plaintiff, SK, and subjected the plaintiff thereby to a continuing and extremely hostile and harmful work environment, as well as engaged actions deliberately intended to injure the plaintiff, SK and materially affect the terms and conditions of his employment and to hinder and ruin his ability to advance and the opportunities available to him, which adverse actions have continued up to the date this action was commenced. Said adverse employment actions were causally related to the plaintiffs' protected oral whistleblowing activities, and included his forced/constructive discharge from the PPPD.

62. The involved BPP superiors are assuredly considered upper management in the BPP and their wrongful conduct was deliberately designed and intended to injure the plaintiff, SK, and/or was committed with knowledge of or with reckless indifference to a high degree of probability of harm to SK. The BPP and certain of its upper echelon employees/superiors at all times acted within the scope of their employment. Upper management thus participated in the unlawful employment acts or was willfully indifferent to the plaintiff, SK.

63. Defendant BPP and/or SL were fully aware and were deliberately indifferent to, or should have known, of the harassment, abuse and misconduct foisted by its upper echelon superiors upon the plaintiff, SK by defendant, SL. It granted those upper echelon superiors authority to control the working environment and conditions which authority, as

set forth above, was abused and misused by those superiors, who acted within the scope of their employment by the Borough. Defendant BPP failed negligently, recklessly, and/or deliberately to have, properly enforce or obey a policy or mechanism for supervising and overseeing those upper echelon superiors, that precludes such ultra vires, improper and retaliatory conduct and/or inaction and that provides for a meaningful and effective procedure for investigation and remediation of such misconduct. The BPP's actions, as well as its inactions, only encouraged, emboldened, facilitated and assisted the wrongdoing of those upper echelon superiors within the BPP.

64. Because of the adverse actions taken in retaliation against him and the hostile environment these actions created, SK was forced by defendants' misconduct to endure severe, continuous and pervasive humiliation, embarrassment, harassment and abuse such that a reasonable person in his circumstances would believe the conditions of employment had been altered and the environment was hostile and abusive, and which no such reasonable person could be expected to endure. Plaintiff SK was caused to suffer, and has continued to suffer, severe emotional and physical distress and injury as well as a constructive discharge and substantial economic and financial loss.

65. As the direct and proximate result of the defendant's wrongful and unlawful retaliation, the plaintiff, SK, has been and will continue to be substantially damaged as aforesaid.

## COUNT FOUR

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

66. Plaintiff repeats the allegations set forth in all preceding paragraphs.

67. As described above, in committing the acts and omissions to act complained of, defendant SL acted intentionally and purposefully to cause the plaintiff emotional distress

13

and injury, and/or acted in reckless disregard for a high degree of probability that emotional distress would follow from his conduct.

68. SL's continuous and relentless conduct was extreme and outrageous and was so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

69. As the direct and proximate cause of the defendant SL's extreme and outrageous intentional and/or reckless conduct, the plaintiff, SK suffered genuine and substantial emotional distress and injury.

70. SL's conduct was so severe and extreme as to cause genuine and substantial emotional distress or mental harm to the average person similarly situated to the plaintiff, and plaintiff SK suffered such severe and substantial emotional distress and mental injury that no reasonable person would be expected to endure.

## COUNT FIVE

### (INVASION OF PRIVACY)

71. Plaintiff SK repeats the allegations set forth in all preceding paragraphs.

72. SL invaded the plaintiff's privacy by acting in the fashion above, said invasion resulting from the intrusion upon the plaintiff's seclusion and privacy concerns, which was highly offensive to the plaintiff/a reasonable person in SK's position.

## COUNT SIX

### (42 U.S.C. § 1983 MUNICIPAL LIABILITY AS AGAINST THE BPP)

73. Plaintiff repeats the allegations set forth in all preceding paragraphs.

74. Prior to the above mentioned dates, the BPP developed, cemented, engrained, upheld, preserved and maintained accepted policies or customs exhibiting deliberate indifference

to the constitutional rights of persons in the BPP, which eventually caused the egregious violations of the plaintiff's rights.

75. Additionally, the BPP failed to use reasonable care in the selection and monitoring of its officers, failed to properly train and/or supervise them and failed to prevent the violations of the plaintiff's rights at the hands of SL.

76. Further, the BPP, under color of state law, directly or indirectly approved or ratified the unlawful, malicious and wanton conduct of defendant SL upon SK herein.

77. Moreover, the BPP failed to train SL as to how to appropriately supervise SK.

78. Unequivocally, the BPP knew or should have known that defendant SL would have to make daily decisions regarding the treatment he visited upon SK.

79. Indeed, the lack of training of defendant SL led to him violating the plaintiff's constitutional rights over and over and over again over a four (4) year period.

80. Notwithstanding the above, the BPP, as policy maker, refused to retain or properly train SL in how to properly supervise SK and other PPPD officers.

81. The lack of training and/or the inadequate training in these areas is surely tantamount to a custom and/or policy that encourages and, indeed as occurred herein, necessitates the violation of these human rights.

82. SL knew/believed that his actions toward SK would not be properly monitored by the BPP or other of SL's superior officers, and that his misconduct would never be adequately investigated or dealt with, but would be tolerated.

83. BPP's blatant and deliberate indifference herein led to the inescapable fact that if it trained SL properly, then the within abhorrent and illegal police actions toward SK would never have taken place.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP 38, the plaintiff herein demands a trial by jury on all counts.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays that this honorable United States District Court:

(a) accept jurisdiction over this matter;

(b) empanel a jury to hear and decide this matter;

(c) award against defendants compensatory and punitive damages in a manner determined by a jury;

(d) placing the PPPD and/or the BPP into Receivership for the purpose of instituting programs to train, instruct, discipline, control and supervise the officers of the PPPD;

(e) award to plaintiff SK the reasonable statutory attorneys' fees, interest and costs of this litigation; and

(f) for such/any other relief that this Court deems equitable and just.

Dated: July 20, 2021 By: *s/ Patrick P. Toscano, Jr.*
Patrick P. Toscano, Jr. (9415)